[Civ. No. 13307. Third Dist. Oct. 24, 1972.]

DOROTHY SHAPIRO et al., Plaintiffs, Cross-defendants and Respondents, v.
ORVAL D. OGLE et al., Defendants, Cross-complainants and Appellants.

## COUNSEL

Arnold, Brownston & White and John Brownston for Plaintiffs, Cross-defendants and Respondents.

Marvin C. Marx for Defendants, Cross-complainants and Appellants.

## OPINION

**PIERCE, J.**[*]—Defendants appeal from a judgment for $5,000 plus interest plus $1,666 attorney's fees in favor of plaintiffs following a court trial. Plaintiffs are mother and son. Named defendants are Orval Ogle, president and general manager of Yolo Car and Trailer Exchange, Inc., a California corporation. George Shelton is a vice-president thereof. The corporation does business under the name of Pan Pacific Mobile Homes (Pan Pacific). Jean McShosh was an employee of the corporation.

This court will hold as a matter of first impression in the interpretation of the Rees-Levering Motor Vehicle Sales and Finance Act (Stats. 1961, ch. 1626) (Civ. Code, §§ 2981-2984.4) that its provisions do not apply to a cash sale where the buyer pays "earnest" money before receiving delivery of a mobile home to be custom-built, where thereafter there is a mutual rescission of the contract, and where the buyer sues to recover such "earnest" money. Hence the judgment applying specific portions of the act must be reversed in part. It will be so reversed with directions.

---

[*]Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

## STATEMENT OF FACTS

On August 22, 1970, Mrs. Shapiro first visited Pan Pacific, with the intention of purchasing a 63' x 24' mobile home of a specified type. She dealt with Jean McShosh, a sales person of the organization. The interview ended with an agreement signed by George Shelton for the seller and by Mrs. Shapiro and her son, Lane, for the buyers. A down payment of $500 was made. The mobile home was to be of a specific type and was to be custom-built. It is unnecessary to state here in detail the negotiations which followed. There were delays (which the trial court with substantial evidence to support it found to be unreasonable) in the delivery of the particular mobile home ordered; Pan Pacific tendered a cancellation of the contract with a payment back of the money advanced or, as an alternative, it offered a substitution of another custom-built mobile home to be specially ordered; there was an election by the Shapiros to accept the latter offer. On October 9, 1970, a new written contract was signed by the parties. In both contracts a printed form was used which, but for the crossed-out provisions, would have been suitable for a conditional sales contract. In both, however, there was the identical purchase price, $19,499, a credit was given for the $500, and there was to be a cash sale upon delivery. Shelton signed for Pan Pacific and both plaintiffs signed as purchasers.

Thereafter Mrs. Shapiro made another payment of $4,500. Again there were delays, Mrs. Shapiro rescinded and demanded her advances back. Pan Pacific was agreeable and tendered its check. Mrs. Shapiro refused it. The check was for $250 less than the total of $5,000 which Mrs. Shapiro had paid. The explanation of the shortage is that while the contract was pending Pan Pacific had paid $250 for a month's rent of the premises occupied by the Shapiros. The Shapiros bought a mobile home from another.

Under the evidence there was no doubt that there was a mutual rescission of the contract.[1] This action was then filed.

Although partially repetitious, it will clarify the issues if we summarize the allegations of the amended complaint. It alleges a first written contract which was termed a "conditional sales contract." The contract, attached to the complaint as plaintiffs' Exhibit "A," called for the payment of the

---

[1]The evidence showed that after the total of $5,000 had been paid and after the delay had been prolonged, the Shapiro sons visited Pan Pacific and talked with defendant Ogle; at that point Mr. Ogle said to the two sons, "I don't want to do business with you any more and I am going to give you back the money . . . ." Mr. Ogle then exhibited the contract, which was torn up in the presence of the sons.

cash purchase price in full before delivery of the mobile home. A down payment of $500 was alleged. Plaintiffs also allege delay in delivery for an unreasonable length of time. Defendants, it is alleged, then offered plaintiffs the alternative of accepting a different but comparable mobile home or of cancelling the contract. Plaintiffs agreed to the substitution and we quote from the complaint, "and the parties thereupon entered into a *new written conditional installment sales contract* with the defendants, on October 1, 1970 . . . ." (Italics ours.) Again the contract is attached to the complaint as Exhibit "B." It is *not* a conditioinal sales contract. It is a contract for cash on delivery with credit for the down payment of $500. In the body of the complaint the second advance payment of $4,500 is then alleged. It is further alleged that there was an unreasonable delay in delivery and a rescission and demand for the total payments made ($5,000) with 7 percent interest from October 9, 1970. Three code sections (parts of the Rees-Levering Act) are then alleged, Civil Code sections 2982.7, 2982 and 2983.4—the last of the three sections being a provision for payment of reasonable attorney's fees and costs to the prevailing party "in any action on a conditional sale contract subject to the provisions of this chapter . . . ." The prayer, in addition to being for a return of $5,000 with interest, was for an attorney's fee of $1,666.67.

All named defendants answered the complaint. They admitted making the contract attached to the amended complaint as Exhibit "B." All other allegations were denied. All defendants also filed a pleading denominated a cross-complaint. The portion thereof which is important herein is paragraph VII, which, without any specification of particulars, states that "Plaintiff [meaning cross-complainant—note use of singular tense] has [*sic*] sustained damages in excess of the sum of $3,899.80." Later an amendment to the cross-complaint was filed. Its only significance is that ALL defendants who had been sued jointly and who had cross-complained jointly joined in the amendment as parties.

The case was tried and the trial court made findings. It found that both contracts were conditional sales contracts under the Rees-Levering Act, that these contracts failed to conform thereto because they did not show (inter alia) "the number of installments required to pay the contract balance, the amount of each installment and the date for payment of the installment." Nevertheless, the trial court treats the complaint as being one *on* the contract. (The court failed to note that both contracts look forward to payment on delivery and both forms expressly set forth that when delivery is made the full contract price of $19,499 will have been paid and that expressly written therein is: "unpaid balance of cash sale price" followed by a zero.)

The findings also disallow to cross-complainants any portion of their alleged damages of $3,899.80. Both the findings and judgment award plaintiffs $5,000 (the down payment) plus 7 percent interest from October 9, 1970, plus an attorney's fee of $1,666 and costs. This is to be paid by all defendants jointly and severally.

Defendants appeal in their status as defendants and from the judgment against them as cross-complainants. The only part of their cross-complaint which they urge on appeal, however, is the disallowance of that portion of the damages claimed which is represented by their payment of the Shapiros' rent in the sum of $250.

## APPLICABLE LAW

■ This court will discuss first the assumption by the Shapiros (accepted by the trial court) that this was a conditional sales contract and that it falls within the provisions of the Rees-Levering Motor Vehicle Sales and Finance Act.

The Rees-Levering Act was the result of an extensive study of the entire scope of motor vehicle sales and financing. (See 15 Assem. Interim Com. Report No. 24, Finance and Insurance (1959-1961) p. 7, printed in 1 Assem. J. Appendix (1961 Reg. Sess.); see also, 10 U.C.L.A. L.Rev. 125; 36 State Bar J. 689.) It was intended "to protect the inexperienced and unwary retail *installment plan* purchaser and yet leave the greatest freedom of contract available to the experienced businessman." (Italics ours.) (36 State Bar J. 689.) The first section of the act sets out the following definitions: "(a) Conditional sale contract means: (1) Any contract for the sale of a motor vehicle between a buyer and a seller, with or without accessories, under which *possession is delivered to the buyer* but the *title vests in the buyer thereafter* only upon the payment of all or part of the price, or upon the performance of any other condition, . . . (b) 'Seller' means a person engaged in the business of selling or leasing motor vehicles *under conditional sales contracts.* (c) 'Buyer' means the person who buys or hires a motor vehicle *under a conditional sale contract.*" (Italics ours.) One must necessarily conclude that the Rees-Levering Act was directed only toward credit sales.

This was not a credit sale. Defendants were constructing for plaintiffs a mobile home to be custom-built. The down payment was in effect "earnest money."[2]

---

[2] In fact Mrs. Shapiro so testified (and there is no dispute). She stated that when she gave the balance of $4,500, $500 having been paid: "That was in completion of making the purchase. That was to bonafi [*sic*] the order we were buying from Marysville."

The printed forms of the contracts of August 22, 1970, and of October 9, 1970, are identical. Neither contains a single reference to a "conditional sale" or anything which could be construed to be a conditional sale either as defined in Civil Code section 2981, or elsewhere, in the Rees-Levering Act or any kind of credit sale under any statute or case law. There are blank provisions from which, had they not been crossed out, a conditional sale could have been deduced. But they were crossed out and the excision was clearly intentional. Immediately above the "x-d" out payment provisions, it is stated:

"(1)                                     CASH PRICE    $ 19,499.00

"   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"INITIAL DOWN
PAYMENT REC'D                 500.00 Recpt

"CASH AGREED
BEFORE DELIVERY         18,999.00

"(2) LESS BUYER'S DOWN PAYMENT                       19,499.00

"3. UNPAID BALANCE OF CASH SALE PRICE        –0–        "

We deem this clear and conclusive as an intended sale with the full purchase price payable on delivery of the mobile home. In addition, since, as we have stated, there was actually a mutual rescission of both contracts, it wouldn't have made any difference whether there had been a conditional sale or a cash sale before rescission. The mutual rescission would have wiped it out and would have placed an equal obligation on both parties to put the other party in equitable status quo.

The trial court, however, evidently treated the litigation as *on the contract*. In fact, both parties were complaining or cross-complaining to rescind under Civil Code section 1692.

Civil Code section 2983.4 provides for payment of a reasonable attorney's fee to the party who prevails "in any action *on a conditional sale contract*." (Italics ours.) But, we repeat, since this is not an action on a conditional sales contract, the court's allowance of an attorney's fee was error.

The fact that both parties were suing after a rescission means that each side was entitled under Civil Code section 1692 "to recover any money

or thing owing to him by any other party to the contract as a consequence of such rescission or for any other relief to which he may be entitled under the circumstances or (b) asserting such rescission by way of defense or cross-complaint."

■ The court did not allow defendants credit for the $250 paid by them to defray one month's rent of the premises occupied by the Shapiros. That was not error. Nor did the court neglect to make a finding in this regard. It expressly found that the allegation of damages in paragraph VII of the cross-complaint was untrue. There was substantial evidence from which the court could infer that the payment was made because defendants, recognizing that their delays had been excessive, had made this payment in an effort to avoid the contract's cancellation by plaintiffs. The finding of the court that those delays had been excessive was also supported by substantial evidence. Disallowance of the $250 by the trial court and award of judgment for $5,000 with interest must be upheld.

■ The joint and several judgment awarded against all of the defendants is challenged. The August and October contracts both purport to be between Pan Pacific as seller and the Shapiros as purchasers. There is nothing we can find in the record to support a claim that either Ogle or Shelton guaranteed or warranted performance or in any other way became involved as individuals. Certainly Jean McShosh, the saleswoman, is not contended to have been in any way involved—except in plaintiffs' pleading. The evidence shows no such involvement. Yet in the cross-complaint all of these individuals, including Jean McShosh, represented by one attorney, are included. That was strange. During oral argument the attorney for respondent conceded that it was the corporation doing business as Pan Pacific to which his clients were looking for reimbursement.

Again, however, there was no appealable error. Code of Civil Procedure section 430 provides that the way to take advantage of a misjoinder of parties is by demurrer. Section 434 provided, when this action was tried, that a failure to demur constitutes a waiver "excepting only . . . [to] the objection that the complaint does not state facts sufficient to constitute a cause of action." In the case at bench the complaint on which the case was tried alleges: "At all times and places herein mentioned, each of the defendants, jointly and individually, and in the alternative, was the agent, servant and employee of each of the remaining defendants, and was at all times and places mentioned herein, acting within the purpose, scope and course of said agency and employment." As stated, no evidence supports this. The waiver provision, however, appears to have become effective and the point was never raised until this appeal.

Other contentions raised require no discussion.

The judgment of the trial court dated July 12, 1971, in favor of plaintiffs and against defendants in the sum of $5,000 together with interest at 7 percent from October 9, 1970, is affirmed. That portion of the judgment allowing plaintiffs attorney fees in the sum of $1,666 is reversed with directions to the trial court to enter a judgment denying attorney fees. In the interest of justice, each party shall bear his own costs on appeal.

Richardson, P. J., and Janes, J., concurred.